EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Ashley M. Torres Feliciano<br><br>Recurrida | Certiorari<br><br>2018 TSPR 159<br><br>201 DPR \_\_\_\_ |

Número del Caso:    CC-2016-55


Fecha: 28 de agosto de 2018


Tribunal de Apelaciones:

    Región Judicial de Ponce

Oficina de la Procuradora General:

    Lcda. Margarita Mercado Echegaray
Procuradora General

    Lcda. Daphne M. Cordero Guilloty
    Procuradora General Auxiliar

 Abogados de la parte Recurrida:

    Lcdo. Julio Fontanet Maldonado
    Lcda. Fabiana Tapia Pimentel
    Lcda. Lillianette Cortés Soto


Materia: Derecho procesal penal y Derecho constitucional. Estándar y método de adjudicación que debe utilizarse al evaluar una solicitud de nuevo juicio al amparo de la Regla 192 de Procedimiento Criminal, en relación con el que debe usarse al evaluar una solicitud de nuevo juicio basada en el derecho constitucional a un debido proceso de ley. Estándar de materialidad requerido por Brady v. Maryland, 373 U.S. 83 (1973), para conceder un nuevo juicio.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Pueblo de Puerto Rico | | *Certiorari* |
| Peticionario | | |
| v. | CC-2016-0055 | |
| Ashley M. Torres Feliciano | | |
| Recurrida | | |

Opinión del Tribunal emitida por la Jueza Asociada señora Pabón Charneco.

En San Juan, Puerto Rico, a 28 de agosto de 2018.

Comparece el Pueblo de Puerto Rico (peticionario) y nos solicita que revoquemos la Sentencia que el Tribunal de Apelaciones emitió el 23 de diciembre de 2015. Mediante el referido dictamen, el foro *a quo* revocó la Resolución que el Tribunal de Primera Instancia emitió el 8 de enero de 2014 y ordenó la celebración de un nuevo juicio.

El presente recurso nos brinda la oportunidad de expresarnos en torno al estándar y el método de adjudicación que debe utilizarse al evaluar una solicitud de nuevo juicio al amparo de la Regla 192 de Procedimiento Criminal, *ante*, *vis-à-vis* al que debe utilizarse al evaluar una solicitud de nuevo juicio basada en el derecho constitucional a un debido proceso de ley. Específicamente, nos permite expresarnos en torno al estándar de materialidad que requiere Brady v. Maryland, infra, para justificar la concesión de un nuevo

juicio ante la supresión de prueba favorable y precisar si determinada prueba favorable suprimida por el Ministerio Público satisface tal estándar.

Con ello en mente, pasemos a delinear los antecedentes procesales del caso de autos.

I

Por hechos ocurridos el 21 de febrero de 2009, el 8 de octubre de 2009, un Jurado emitió un veredicto unánime de culpabilidad contra la Sra. Ashley Marie Torres Feliciano (Ashley o recurrida). La encontraron culpable de haberle provisto a su novio –Steven Quirindongo (Steven)- el arma blanca con la que este mató a Nelson Figueroa Feliciano (Nelson), hermano de Ashley. Consecuentemente, fue convicta como coautora de Asesinato en Primer Grado, Art. 106 del Código Penal de 2004 y de Portación y Uso de Armas Blancas, Art. 5.05 de la Ley Núm. 404 de 11 de septiembre de 2000, según enmendada, conocida como la Ley de Armas de Puerto Rico, 25 LPRA sec. 458d. El Tribunal de Primera Instancia la sentenció a cumplir una pena de reclusión de ciento once (111) años.

El 16 de septiembre de 2013, la recurrida presentó una Moción de Nuevo Juicio al amparo de las Reglas 192 y 192.1 de Procedimiento Criminal y de la cláusula del debido proceso de ley de la Constitución de Estados Unidos y de la Constitución de Puerto Rico. Emda. VI, Const. EE.UU., LPRA, Tomo 1; Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. En cuanto a la base estatutaria, arguyó que advino en conocimiento de

nueva prueba que demostraba su inocencia. La alegada nueva prueba consistía en: (1) el testimonio de Steven,[1] convicto por los mismos hechos; (2) una nueva declaración del testigo Luis E. Rodríguez Cruz (Luis)[2] y (3) una nueva declaración de la madre de la recurrida, Lucrecia Feliciano Quiñones (Lucrecia). En cuanto a la base constitucional, sostuvo que el Ministerio Público suprimió prueba favorable y material a la culpabilidad de la recurrida, consistente en: las notas de la Agte. Brunilda Borrero, el Informe de Análisis de Escena que preparó el Agte. René Rodríguez y dos hojas que la Dra. Sylvette Lugo preparó y anejó al récord médico de Nelson, la víctima del delito.

El Tribunal de Primera Instancia celebró una Vista Evidenciaria y denegó la Moción de Nuevo Juicio.[3] Sostuvo que la "nueva prueba" no era creíble. Particularmente, determinó que el testimonio de Steven era "mendaz y acomodaticio" y que no "merec[ía] ninguna credibilidad".[4] Asimismo, ponderó el testimonio de retracto de Luis a la luz de lo resuelto en Pueblo v. Chévere Heredia, 139 DPR 1 (1995) y concluyó que no merecía "ninguna credibilidad".[5] Enfatizó que Luis declaró cinco (5) veces de forma extensa, detallada y consistente, como parte de los procedimientos en Pueblo v.

---

[1] Petición de Certiorari, Apéndice, pág. 160, nota 2.

[2] Cuñado de la víctima del delito, Nelson Figueroa Feliciano (Nelson).

[3] Lucrecia Feliciano Quiñones (Lucrecia) se negó a testificar en la Vista Evidenciaria.

[4] Íd., págs. 75-76.

[5] Íd., pág. 76.

<u>Torres Feliciano</u>, JVP2009G0033 y <u>Pueblo v. Steven</u> <u>Quirindongo</u>, JVI2011G0062, y que su testimonio fue corroborado por amplia prueba testifical. Comparado con los testimonios que Luis brindó en la Vista Preliminar, en la Vista Preliminar en Alzada y durante ambos juicios, su testimonio en la Vista Evidenciaria fue "escueto, flaco y descarnado".[6] En cuanto al Informe de Análisis de Escena que preparó el agente Rodríguez, las notas de la agente Borrero y las hojas del récord médico que preparó la doctora Lugo, concluyó que no constituían nueva prueba porque estaban disponibles con razonable diligencia para ser utilizadas por la defensa y que no hubieran producido un resultado diferente. Destacó que las notas iniciales de la agente Borrero y el agente Rodríguez no iban dirigidas a una posible coautoría de Ashley porque —según ambos testificaron— la investigación inició como una de violencia doméstica en la que Ashley era una víctima.

Inconforme, la recurrida presentó una Petición de <u>Certiorari</u> ante el Tribunal de Apelaciones. Arguyó que el foro primario no empleó el estándar aplicable a solicitudes de nuevo juicio basadas en la supresión de prueba exculpatoria.[7] Adujo que el Estado no descubrió: (1) las notas de la agente Borrero; (2) las hojas del expediente

---

[6] <u>Íd.</u>

[7] No solicitó revisión de las determinaciones relacionadas con las declaraciones presuntamente nuevas de Steven Quirindongo (Steven), Luis E. Rodríguez Cruz (Luis) y Lucrecia Feliciano Quiñones (Lucrecia), en las que la recurrida basó su planteamiento estatutario.

médico de Nelson en las que la doctora Lugo plasmó la última conversación que sostuvo con él y (3) el Informe de Análisis de Escena. Arguyó que dichos documentos constituían prueba exculpatoria y que al suprimirla se le violó el derecho a un debido proceso de ley. En síntesis, sostuvo que en ninguno de los documentos se le vinculó con la muerte de su hermano y que estos únicamente apuntaban como sospechoso a Steven. El Estado presentó la oposición correspondiente.

El 23 de diciembre de 2016, el Tribunal de Apelaciones emitió una Sentencia en la que revocó la Resolución emitida por el foro primario y ordenó la celebración de un nuevo juicio. El foro apelativo intermedio entendió que el foro primario no aplicó el estándar correcto al evaluar la procedencia de la solicitud de nuevo juicio. Por su parte, concluyó que de haber estado disponible para la defensa, la prueba en cuestión hubiera arrojado una luz diferente en el juicio al punto de socavar la confianza en el veredicto. Inconforme, el peticionario presentó ante este Tribunal la Petición de <u>Certiorari</u> que nos ocupa y planteó la comisión de los errores siguientes:

1. Erró el Tribunal de Apelaciones al expedir el auto de *certiorari* solicitado por la señora Ashley Torres Feliciano y ordenar la celebración de un nuevo juicio.

2. Erró el Tribunal de Apelaciones al concluir, que las dos hojas que se anejaron al informe médico preparado por la Dra. Sylvette Lugo y las notas de la agente Brunilda Borrero sobre su intervención en este caso, constituyen evidencia nueva y creíble que produciría un resultado diferente.

3. Erró el Tribunal de Apelaciones al concluir que el Informe de Análisis de Escena es evidencia exculpatoria que fue suprimida por el Ministerio Fiscal y que, de haber estado disponible al momento del juicio, hubiera arrojado una luz diferente en el juicio al punto de socavar la confianza en su resultado.

Atendido el recurso, el 12 de julio de 2016, confirmamos el dictamen recurrido por encontrarnos igualmente divididos. Examinada la primera Moción de Reconsideración presentada por el peticionario, el 28 de octubre de 2016, expedimos el auto solicitado. Contando con el beneficio de los alegatos de ambas partes, nos encontramos en posición de resolver el recurso sin ulterior trámite.

II

La Moción de Nuevo Juicio fundada en el descubrimiento de prueba que no estuvo disponible durante el juicio tiene base estatutaria y constitucional. El análisis o estándar aplicable depende del fundamento en virtud del cual se solicite el nuevo juicio. La médula del presente recurso yace en la aplicación de estos estándares. Por esta razón, procedemos a reseñarlos y a distinguirlos, no solo para disponer del recurso ante nos sino para facilitar la adjudicación de controversias futuras afines.

A.

Las Reglas 188(a) y 192 de Procedimiento Criminal, *supra*, regulan las mociones de nuevo juicio ordinarias; aquellas basadas en el descubrimiento de nueva prueba. 34 LPRA Ap. II, Rs. 188(a), 192. El uso y aplicación de estos remedios depende de cuándo se adviene en conocimiento de la

nueva prueba. La Regla 188(a) provee el vehículo procesal para solicitar un nuevo juicio cuando se descubre nueva prueba antes de que el tribunal dicta Sentencia. A contrario sensu, la Regla 192 provee para la solicitud de un nuevo juicio cuando se adviene en conocimiento de nueva prueba después de dictada la Sentencia.

Independientemente de que la Moción de Nuevo Juicio se presente al amparo de la Regla 188(a) o de la Regla 192 de Procedimiento Criminal, supra, únicamente procede cuando la nueva prueba: (1) no pudo ser descubierta con razonable diligencia antes del juicio; (2) no es meramente acumulativa; (3) no es prueba de impugnación; (4) es creíble y (5) probablemente produciría un resultado diferente. Pueblo v. Rodríguez, 193 DPR 987, 998-1000 (2015); Marcano v. Parrilla (II), 168 DPR 721, 738 (2006); Pueblo v. Chévere Heredia, supra. Estos requisitos componen la llamada "Berry Rule".[8] La prueba en la que se sustenta debe ser verosímil y no puede ser acumulativa pues, de serlo, sería improbable que produjera un resultado distinto de haber estado disponible. Cabe destacar que estos criterios única y exclusivamente pueden ser utilizados al evaluar una Moción de Nuevo Juicio basada en el descubrimiento de nueva prueba bajo las Reglas 188(a) y 192 de Procedimiento Criminal, supra. Véase: Pueblo v. Rodríguez, supra, pág. 996; Pueblo v. Velázquez Colón,

---

[8] Se le conoce como la "Berry Rule" pues tuvo su génesis en el caso Berry v. State, 11 Ga. 511, 527 (1851).

174 DPR 304, 327-329 (2008); 3 Wright and Miller, Federal Practice and Procedure: Crim., 3d Sec., 584 (2004).

En Pueblo v. Marcano Parrilla II, supra, aclaramos el estándar que rige la Moción de Nuevo Juicio bajo la Regla 192 de Procedimiento Criminal, supra. Allí, reconocimos que resultaba "muy oneroso" requerirle a un convicto que la nueva prueba demostrara su inocencia de forma exacta, certera e incontrovertible como habíamos indicado en Pueblo v. Marcano Parrilla, 152 DPR 557 (2000). Así las cosas, reconsideramos nuestro dictamen y resolvimos que

> un nuevo juicio según [la Regla 192 de Procedimiento Criminal, supra] procede si al analizar la nueva evidencia junto a la presentada en el juicio original de la forma más favorable para al fallo o veredicto de culpabilidad que se impugna, resulta que esta evidencia pudo haber creado duda razonable en el ánimo del juzgador en cuanto a la culpabilidad del peticionario. Esto es, la nueva prueba debe demostrar que es más probable que el convicto sea inocente a que sea culpable. Íd., pág. 740.

Nótese que bajo la Regla 192 de Procedimiento Criminal, supra, la presunta nueva prueba no puede ser analizada de forma aislada. A contrario sensu, tiene que ser evaluada a la luz de toda la prueba admitida durante el juicio que dio lugar a la convicción y de la forma más favorable al fallo o veredicto que se impugna.

### B.

Las solicitudes de nuevo juicio extraordinarias son aquellas basadas en la supresión u ocultación de prueba por parte del Ministerio Público. Estas se presentan al amparo del debido proceso de ley y del derecho constitucional a un

juicio justo. Pueblo v. Rodríguez, supra, pág. 1002. Como veremos, aún en estos casos la concesión de un nuevo juicio no es automática. Para determinar cuándo procede, debemos examinar lo resuelto por el Tribunal Supremo federal en Brady v. Maryland, infra, su progenie, y la jurisprudencia interpretativa de este Tribunal en cuanto al tema. Veamos.

En Brady v. Maryland, 373 US 83, 87 (1973), el Tribunal Supremo de Estados Unidos resolvió que la supresión de prueba favorable a un acusado, por parte del Ministerio Público, constituye una violación al debido proceso de ley cuando la prueba es material a su culpabilidad o castigo, independientemente de la buena o la mala fe con la que haya obrado el Ministerio Público. El remedio adecuado en tales casos es revocar la convicción y conceder un nuevo juicio. Íd.; Pueblo v. Hernández Santana, 138 DPR 577, 588 (1995). Sin embargo, además de examinar la naturaleza de la prueba suprimida u ocultada, es necesario auscultar el efecto probable que hubiera tenido su divulgación oportuna en el resultado del proceso criminal. Ello, pues sólo procede conceder un nuevo juicio bajo Brady v. Maryland, supra, cuando la prueba suprimida u ocultada por el Estado es: (1) favorable al acusado y (2) material a su culpabilidad o castigo. U.S. v. Bagley, 473 US 667, 674 (1985).

Para efectos de Brady v. Maryland, supra, la "prueba favorable" puede consistir tanto en prueba sustantiva (prueba exculpatoria) como en prueba de impugnación. Véanse: Pueblo v. Velázquez Colón, supra, pág. 330; U.S. v. Bagley,

supra, pág. 676 (Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule); Giglio v. U.S., 405 US 150, 154 (1972); E.L. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Colombia, Forum, Vol. II, pág. 40. A estos efectos, hemos indicado que prueba exculpatoria no es toda prueba que por sí sola es capaz de producir la absolución del acusado sino aquella que *puede* favorecerlo, **sin considerar su materialidad o confiabilidad.** Pueblo v. Vélez Bonilla, 189 DPR 705, 719 (2013) citando a Pueblo v. Echevarría, 128 DPR 299, 333 (1991) (Énfasis nuestro). Por su parte, la prueba de impugnación es 'prueba favorable' para efectos de Brady v. Maryland, supra, pues, de ser utilizada efectivamente por la defensa, puede representar la diferencia entre una absolución y una convicción. U.S. v. Bagley, supra, pág. 676. Cabe mencionar que la supresión de prueba impugnatoria es igualmente perjudicial que la supresión de prueba exculpatoria; su supresión tampoco justifica la concesión automática de un nuevo juicio. Íd. (This Court has rejected any such distinction between impeachment evidence and exculpatory evidence); U.S. v. Giglio, supra, pág. 154.

El que la prueba suprimida por el Ministerio Público sea favorable al acusado –por ser exculpatoria o de impugnación– es condición necesaria pero no suficiente para conceder un nuevo juicio bajo Brady v. Maryland, supra. La naturaleza, calidad y el peso de la prueba favorable suprimida es igual o más importante que la existencia misma

de la prueba. Pueblo v. Echevarría Rodríguez, supra, pág. 333. Tan es así que únicamente procede la concesión de un nuevo juicio, ante la supresión de prueba favorable al acusado, cuando tal prueba es *material* a su culpabilidad o castigo. Véanse: U.S. v. Turner, 137 S.Ct. 1885 (2017) (La supresión de prueba exculpatoria e impugnatoria no justificó conceder un nuevo juicio); Strickler v. Greene, 527 US 263 (1999) (La supresión de prueba de impugnación no justificó conceder un nuevo juicio); U.S. v. Agurs, 427 US 97, 114 (1976) (La supresión de prueba exculpatoria no justificó conceder un nuevo juicio). Véanse además: Pueblo v. Vélez Bonilla, supra, pág. 724 ("[E]n instancias en las que hemos evaluado la alegada violación al debido proceso de ley por incumplimiento del Estado en descubrir evidencia claramente exculpatoria, hemos sido consistentes en exigir que el acusado no solo demuestre que la evidencia le era favorable, sino que era constitucionalmente material para su defensa"); Pueblo v. Arzuaga, 160 DPR 520, 539 (2003)("El no [revelar indicios de falso testimonio o no descubrir prueba exculpatoria] **podría** acarrear la *revocación de la convicción* y la celebración de un nuevo juicio. Ello dependerá de la relevancia y la materialidad de la evidencia suprimida…") (Énfasis suplido); Pueblo v. Echevarría Rodríguez, supra, págs. 333-334; E.L. Chiesa Aponte, *op. cit.*, pág. 44.

El análisis de materialidad fue desarrollado en U.S. v. Bagley, supra, y Kyles v. Whitley, infra. El propósito de este análisis es auscultar la magnitud del perjuicio que

causó la supresión de la prueba favorable al derecho que tiene todo acusado a un juicio justo. U.S. v. Bagley, supra, pág. 675. La piedra de toque del análisis de materialidad esbozado en U.S. v. Bagley, supra, es la "probabilidad razonable" de un resultado distinto. Consecuentemente, la prueba suprimida solamente es material si existe una probabilidad razonable que, de haber sido divulgada oportunamente, el resultado del proceso criminal hubiera sido distinto. U.S. v. Bagley, supra, pág. 682. A su vez, existe la probabilidad razonable de un resultado distinto cuando la prueba suprimida por parte del Ministerio Público es tal que socava la confianza en el resultado del juicio criminal. Kyles v. Whitley, supra, pág. 434 citando a U.S. v. Bagley, supra, pág. 678.

En Kyles v. Whitley, supra, págs. 434-436, el Tribunal Supremo federal aclaró varios aspectos del estándar de materialidad. **Primero**, la cuestión a resolver es si el acusado gozó de un juicio justo, definido como un juicio cuyo veredicto es digno de confianza. Smith v. Cain, 565 US 73, 75-76 (2012) citando a Kyles v. Whitley, supra, pág. 434. Bajo el estándar de materialidad es innecesario demostrar si resulta más probable que el acusado fuera inocente que culpable de haberse divulgado la prueba suprimida, como requiere la Regla 192 con respecto a la "nueva prueba". Véase: Marcano Parrilla II, supra, pág. 740. En ese sentido, el estándar de materialidad es menos riguroso que el estándar utilizado al evaluar una solicitud de nuevo

juicio bajo la Regla 192. Pueblo v. Velázquez Colón, supra, pág. 328. **Segundo**, el análisis de materialidad no consiste ni equivale a un análisis de suficiencia de prueba. Es decir, un convicto no tiene que demostrar que, aquilatada toda la prueba incriminatoria a la luz de la prueba suprimida, no habría suficiente prueba para obtener una convicción. A contrario sensu, tiene que demostrar que la prueba suprimida u ocultada era capaz de arrojar una luz diferente en el caso al punto de socavar la confianza en el veredicto. **Tercero**, una vez el Tribunal determina que la prueba suprimida es material, el análisis termina y procede conceder un nuevo juicio. **Por último**, el efecto de la supresión de la prueba en la fiabilidad del resultado debe medirse cumulativamente mas no individualmente. Los tribunales debemos analizar cómo cada pieza de prueba favorable suprimida puede afectar el caso y luego evaluar si el efecto neto de tal prueba, a la luz de toda la prueba admitida en el juicio, es de tal magnitud que arroja una luz diferente en el caso y socava la confianza en el veredicto de culpabilidad.

En resumen, no toda supresión u ocultación de prueba favorable al acusado, por parte del Ministerio Público, constituye una violación a la norma de Brady v. Maryland, supra. Solamente existe una violación a la norma de Brady v. Maryland, supra, cuando es razonablemente probable que la divulgación oportuna de la prueba favorable suprimida u ocultada hubiera provocado un resultado distinto, lo cual se cumple, a su vez, cuando el efecto cumulativo de la prueba

favorable suprimida arroja una luz diferente en el caso, por lo que socava la confianza en el veredicto. En aras de facilitar el análisis de una violación a la norma de <u>Brady v. Maryland</u>, supra, enfatizamos que para conceder un nuevo juicio ante la supresión u ocultación de prueba es necesario que concurran los elementos siguientes: (1) la prueba en cuestión tiene que ser favorable al acusado, ya sea porque es exculpatoria o porque es de impugnación; (2) la prueba debe haber sido suprimida u ocultada por el Estado, inadvertida o intencionalmente y (3) la supresión u ocultación debe haber causado perjuicio, lo cual implica analizar si la prueba es material con respecto a la culpabilidad o al castigo del acusado. Véase: <u>Strickler v. Greene</u>, supra, págs. 281-282.

Evaluado el desarrollo de la norma pautada en <u>Brady v. Maryland</u>, supra, profundizamos en cuanto a su tercer y último elemento: el estándar de materialidad.

C.

Al analizar la jurisprudencia de este Tribunal en cuanto al tema, notamos que los conceptos *material*, *pertinente* y *relevante* han sido utilizados indistintamente para referirse al tipo de prueba cuya supresión infringe el derecho de todo acusado a un debido proceso de ley y amerita la concesión de un nuevo juicio. Véanse: <u>Pueblo v. Velázquez Colón</u>, supra, págs. 330, 332, 335; <u>Pueblo v. Arzuaga</u>, supra, pág. 536; <u>Pueblo v. Echevarría Rodríguez</u>, supra, pág. 333; <u>Pueblo v.</u>

Hernández García, 102 DPR 506, 511 (1974). Sin embargo, cabe hacer algunas distinciones.

Por un lado, *relevancia* y *pertinencia* son conceptos que corresponden al ámbito del descubrimiento de prueba. Se refieren al criterio general con el que determinada prueba debe cumplir para ser descubrible. Véase: Reglas 95(a)(3)-(4),(6) y Regla 95(e) de Procedimiento Criminal, supra. En lo criminal, además de prueba *relevante* y/o *pertinente* a la defensa del acusado, el Ministerio Público viene obligado, por imperativo constitucional, a descubrir indicios de falsedad en la prueba del Estado y prueba exculpatoria. Regla 95(b) de Procedimiento Criminal, supra. Véase además: Pueblo v. Arzuaga, supra, pág. 538. Por otro lado, *materialidad* se refiere al estándar desarrollado por el Tribunal Supremo federal para examinar cuándo procede dejar sin efecto una convicción y conceder un nuevo juicio ante la supresión de prueba favorable. Véase: E.L. Chiesa Aponte, op. cit., pág. 44. En ese sentido, el Ministerio Público tiene la obligación de descubrir prueba exculpatoria, sin que medie solicitud previa. Sin embargo, únicamente procede revocar una convicción y conceder un nuevo juicio ante la supresión de prueba favorable cuando la misma es *material* según U.S. v. Bagley, supra, y Kyles v. Whitley, supra.

Al evaluar si procede conceder un nuevo juicio a raíz de la supresión de prueba favorable, el reto mayor estriba en determinar si la prueba suprimida es material a la culpabilidad o al castigo del acusado. El análisis de

materialidad debe realizarse caso a caso ya que depende de los hechos particulares del caso, de la prueba admitida en el juicio que dio lugar a la convicción y de la prueba en la que se funda la solicitud de nuevo juicio. Examinemos los pronunciamientos del Tribunal Supremo federal sobre este particular.

En Brady v. Maryland, supra, dos coacusados fueron convictos de asesinato en primer grado y condenados a la pena de muerte. En su juicio, Brady admitió ser coautor del delito; sin embargo, adujo que el coacusado, Boblit, fue quien mató a la víctima. El Ministerio Público suprimió una confesión de Boblit. Al descubrir la prueba, Brady solicitó un nuevo juicio y, aunque no controvirtió que fuera culpable del asesinato, adujo que la confesión del coautor incidía en la pena a imponérsele.[9] El Tribunal consideró que la supresión fue perjudicial y concedió un nuevo juicio en cuanto al asunto de la pena.

En U.S. v. Giglio, supra, el Ministerio Público suprimió un acuerdo en virtud del cual el Estado le prometió a un coconspirador que no presentaría cargos en su contra a cambio de que testificara contra el acusado. Íd., pág. 150. El Tribunal concedió un nuevo juicio y enfatizó que el coconspirador era el único testigo de cargo que conectó al acusado con el delito; que el caso dependía casi enteramente de su testimonio y que, sin este, no se hubiera obtenido la

---

[9] El delito en cuestión era asesinato estatutario cuya pena en Maryland era cadena perpetua o la muerte. Brady v. Maryland, 373 US 83, 85 (1963).

acusación y tampoco hubiera sido posible someter el caso a la consideración del Jurado. Íd., págs. 154-155.

En U.S. v. Agurs, supra, una persona fue convicta de asesinato en segundo grado por matar a otra con un arma blanca. El Ministerio Público ocultó que la víctima tenía un récord criminal que incluía declaraciones de culpabilidad por los delitos de agresión y posesión de arma blanca. Íd., págs. 100-101. La defensa arguyó que tal prueba apoyaba la teoría de que la convicta actuó en defensa propia. La prueba de cargo reveló que la víctima portaba dos cuchillos, incluyendo el que utilizó para cometer el delito; que la víctima fue apuñalada en varias ocasiones y que la convicta no tenía lesión alguna. Íd. El Tribunal revocó el nuevo juicio concedido. Enfatizó la necesidad de evaluar la prueba suprimida a la luz de la prueba admitida en el juicio. Afirmó estar satisfecho con la apreciación del foro inferior en cuanto a que la prueba de impugnación suprimida no contradecía prueba de cargo alguna y era acumulativa, por lo que no creaba duda razonable ni justificaba la concesión de un nuevo juicio. Íd., pág. 114.

En Kyles v. Whitley, supra, un convicto de asesinato en primer grado solicitó un nuevo juicio. El Ministerio Público ocultó: (1) las declaraciones de seis testigos oculares; (2) tres declaraciones inconsistentes del informante, Beanie, que vinculó a Kyles y cuyo testimonio era medular para el Estado; (3) una hoja con los números de tablilla de los carros que estaban estacionados en el lugar de los hechos y

en la que no aparecía el carro de Kyles; (4) un memorando interno de la policía preparado a raíz de información brindada por Beanie y (5) prueba que conectaba a Beanie con otros delitos en el lugar de los hechos, incluyendo el asesinato de una mujer. Íd., págs. 428-429.

Tras considerar la prueba favorable suprimida a la luz de la prueba desfilada en el juicio, el Tribunal concluyó que el efecto neto de la prueba favorable suprimida hacía razonablemente probable que, de haberse divulgado, el resultado del juicio hubiera sido distinto. Primero, las declaraciones suprimidas afectaban sustancialmente la credibilidad de los únicos dos testigos que identificaron al acusado y que declararon haber presenciado el asesinato. De estas surgía que uno de ellos no observó al perpetrador y que la descripción que ambos ofrecieron del presunto asesino era inconsistente. Íd., págs. 441-443, 454. Segundo, las declaraciones inconsistentes de Beanie hubieran minado sustancialmente su credibilidad y la investigación de la policía en general. Íd., pág. 445. Por último, la lista de carros tenía algún valor exculpatorio. El Ministerio Público arguyó que Kyles llegó al supermercado, estacionó su carro, asesinó a la víctima y huyó en el carro de esta. Sin embargo, en la lista no aparecía la tablilla del carro de Kyles. Íd., pág. 450.

En Strickler v. Greene, supra, un individuo convicto y sentenciado a morir por el secuestro, robo y asesinato de una estudiante solicitó un nuevo juicio. Adujo que el Estado

ocultó prueba de impugnación que minaba la credibilidad de la única testigo de cargo que declaró sobre el secuestro. Durante el juicio, la testigo indicó que el día de los hechos observó de cerca al acusado por lo que podía identificarlo, negó que la publicidad del caso la hubiera ayudado a identificarlo y afirmó que tenía una memoria excepcionalmente buena.[10] Íd., pág. 273. Sin embargo, de los documentos ocultados surgía que la propia testigo reconoció tener dudas sobre la identidad de la víctima; que no recordaba haber estado en el lugar de los hechos y que tenía una memoria exigua sobre lo ocurrido. Íd., págs. 273-275. A pesar de ello, el Tribunal resolvió que no existía una probabilidad razonable de que el resultado del proceso criminal hubiera variado de haberse divulgado la prueba ocultada. Tras reseñar la prueba desfilada en el juicio, concluyó que aunque impugnaran rigurosamente a la testigo, el individuo hubiera sido convicto y sentenciado a morir por el asesinato de la estudiante. Ello, debido a que aún minando la credibilidad de la única testigo de cargo que declaró en torno al secuestro existía prueba testifical, física y forense que lo incriminaba con el robo armado, lo cual constituía base independiente suficiente para encontrarlo culpable por el asesinato y sentenciarlo a la pena capital. Íd., pág. 294.

---

[10] La prueba impugnatoria consistía en: las notas que preparó un detective tras haber entrevistado a la testigo de cargo y varias cartas que la testigo de cargo le cursó al detective brindándole información sobre los hechos presuntamente percibidos.

En Smith v. Cain, supra, un individuo convicto de asesinar a cinco personas durante un robo armado solicitó un nuevo juicio. Adujo que el Estado ocultó documentos que contradecían el testimonio del único testigo de cargo que lo vinculó con el delito. Íd., págs. 629-630. Durante el juicio, el testigo afirmó estar seguro que el convicto fue el asesino pues la noche de los hechos se encontró con él cara a cara. Íd., pág. 630. No obstante, de la prueba suprimida surgía que el testigo era incapaz de proveer una descripción precisa del autor del delito y de reconocerlo. Íd. El Tribunal resolvió que la prueba ocultada era claramente material para fines de Brady v. Maryland, supra, y ordenó la celebración de un nuevo juicio. Si bien reconoció que determinada prueba impugnatoria puede ser inmaterial si el resto de la prueba del Estado es suficientemente sólida como para sostener la confianza en el veredicto, enfatizó que el testimonio del testigo ocular era la única prueba que conectaba al convicto con el delito. Íd. citando a U.S. v. Agurs, supra, págs. 112-113 y n. 21.

En Wearry v. Cain, 136 S.Ct. 1002 (2016), un convicto de asesinato solicitó un nuevo juicio. Quien único conectó a Wearry con el delito fue Sam Scott, cuyo testimonio fue corroborado por el testimonio igualmente suspicaz de Edwin Brown.[11] Íd., pág. 1006. El Estado ocultó, *inter alia*: (1)

---

[11] Sam Scott –testigo estrella del Estado- implicó a Wearry con el delito dos (2) años luego de ocurridos los hechos. Para la fecha del juicio, Scott ofreció cinco (5) versiones distintas de los hechos. Edwin Brown, convicto por otros hechos, fungió también como testigo ocular.

récords de los cuales surgía que Scott quería asegurarse que Wearry obtuviera la pena de muerte y que inclusive instó a otro confinado a mentir e incriminar a Wearry con el asesinato, bajo la creencia de que ello lo ayudaría a salir de prisión y (2) que Brown intentó llegar a un acuerdo con el Estado en varias ocasiones, contrario a lo que el Ministerio Público le hizo creer al Jurado durante el juicio. Íd., pág. 1005.[12] El Tribunal concluyó que la prueba suprimida socavó la confianza del resultado del juicio. La credibilidad de Scott -quien fue impugnado con múltiples declaraciones anteriores inconsistentes- hubiera sido minada aún más al revelarse que instó a otro confinado a mentir sobre el asesinato y/o que deseaba ver a Wearry muerto. Íd., págs. 1006-1007. Asimismo, el jurado que creyó el testimonio de Scott luego de escuchar el testimonio de Brown probablemente no lo hubiera hecho si hubiera sabido que, contrario a lo que manifestó el Ministerio Público, Brown declaró contra Wearry a cambio de una posible reducción de sentencia. Íd.

En Turner v. U.S., 137 S.Ct. 1885 (2017), siete convictos por el secuestro, robo y asesinato de una joven solicitaron un nuevo juicio al amparo de Brady v. Maryland, supra. Durante el juicio, el Ministerio Público adelantó la

---

[12] Durante el juicio, Brown indicó que testificó contra Wearry porque su hermana conocía a la hermana de la víctima mas no por obtener favor alguno del Estado. En su informe final, el Ministerio Público enfatizó que Brown no solicitó nada a cambio de su testimonio, que no llegó a ningún acuerdo con el Estado a cambio de su testimonio y que testificó porque pensaba que la familia de la víctima merecía saber la verdad de lo ocurrido. Wearry v. Cain, 136 S.Ct. 1002, 1003 (2016).

teoría de que la víctima fue atacada por un grupo de personas. La principal prueba de cargo fue el testimonio de Calvin Alston y Harry Bennett quienes, además de confesar ser coautores del delito, fueron consistentes al afirmar que atacaron a la víctima junto a otros diez jóvenes. El testimonio de Alston y Bennett fue apoyado por al menos cinco testigos que de una manera u otra corroboraron que la víctima fue atacada por un grupo de personas. Ninguno de los convictos testificó durante el juicio ni controvirtió que la víctima fuera atacada por un grupo de personas; se limitaron a impugnar la credibilidad de quienes los colocaban en la escena del crimen. Sin embargo, la defensa adujo que la prueba ocultada por el Estado les hubiera permitido disputar la teoría del 'ataque grupal' en la que el Estado descansó y, a su vez, formular una nueva teoría, a saber: que la víctima fue atacada por una o dos personas. Íd., págs. 1893-1894.

El Tribunal indicó que la prueba que el Estado ocultó era muy poca, muy débil, o muy remota a la prueba de cargo para cumplir con el estándar de Brady v. Maryland, supra. Íd., pág. 1894. Hizo hincapié en que la defensa hubiera tenido que convencer al jurado de que: (1) Alston y Bennett confesaron ser coautores de un ataque grupal que nunca ocurrió; (2) otros acusados se incriminaron falsamente con el 'ataque grupal' y ya sea coordinadamente o coincidentemente narraron hechos similares y (3) otros testigos también declararon sobre un 'ataque grupal'

inexistente. Íd. Concluyó que no se demostró probabilidad razonable de que la prueba ocultada hubiera cambiado el resultado del juicio criminal.

Cabe destacar que en los casos antes citados el Tribunal reseñó y consideró la prueba admitida durante el juicio a la hora de evaluar si la prueba favorable suprimida era material para efectos de Brady v. Maryland, supra. Véanse: Turner v. U.S., supra, págs. 1889-1891, 1893-1895; Weary v. Cain, supra, págs. 1003-1004; Smith v. Cain, supra, págs. 74-76; Strickler v. Greene, supra, págs. 266-275, 291-296; Kyles v. Whitley, supra, págs. 429-432, 441-451; U.S. v. Agurs, supra, pág. 112. Véase también Pueblo v. Velázquez Colón, supra, págs. 315-317.

D.

Para conceder un nuevo juicio bajo la norma de Brady v. Maryland, supra, la prueba favorable suprimida debe ser material con respecto a la **culpabilidad** o al castigo del convicto. Por tal razón, es necesario considerar las disposiciones relativas a la participación y tener presente los elementos de los delitos por los cuales se le declaró culpable.

Un delito puede ser cometido por una persona que actúa individualmente o por varias personas que contribuyen para adelantar un propósito delictivo común. Existen dos teorías principales bajo las que se estudian las formas de autoría y participación, a saber: "la teoría de la equivalencia" y la "teoría de la diferenciación". L.E. Chiesa Aponte, Derecho

Penal Sustantivo, Estados Unidos, Pubs. JTS, 2007, págs. 176-77. Para un análisis sobre ambas teorías véase Pueblo v. Sustache Sustache, 176 DPR 250, 295-296 (2009). Nuestro Código Penal de 2004, 33 LPRA secs. 4630 *et seq.*, vigente a la fecha de los hechos que nos ocupan, adoptó la teoría de la diferenciación, la cual rige en los países de tradición civilista. Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 177.[13]

La teoría de la diferenciación distingue a los sujetos activos de un hecho punible y los cataloga como autores o partícipes. Bajo esta teoría la persona responde según su grado de participación en el hecho delictivo. D. Nevares-Muñiz, Derecho Penal Puertorriqueño Parte General, San Juan, Instituto para el Desarrollo del Derecho, Inc., 2015, pág. 352. Por esta razón, a los cooperadores -considerados partícipes del hecho delictivo- se les trata de forma más benigna que a los autores. Véase el Art. 45 del Código Penal de 2004, 33 LPRA sec. 4667. El Art. 43(d) del Código Penal de 2004 clasificó como autores a:

    (a) Los que toman parte directa en la comisión
        del delito.
    (b) Los que fuerzan, provocan, instigan o inducen
        a otra persona a cometer el delito.
    (c) Los que se valen de una persona inimputable
        para cometer el delito.
    **(d) Los que cooperan con actos anteriores,
        simultáneos o posteriores a la comisión del
        delito, sin cuya participación no hubiera
        podido realizarse el hecho delictivo.**

---

[13] Aunque el Código Penal de 2012 abandonó la teoría de la diferenciación y la sustituyó por la teoría de la equivalencia, la Ley 246-2014 enmendó dicho código y la reincorporó a nuestro ordenamiento. D. Nevares-Muñiz, Derecho Penal Puertorriqueño – Parte General, San Juan, Instituto para el Desarrollo del Derecho, Inc., págs. 352-353.

(e)  Los que se valen de una persona jurídica para cometer el delito.

(f)  Los que actúen en representación de otro o como miembro, director, agente o propietario de una persona jurídica, siempre que haya una ley que tipifique el delito y realicen la conducta delictiva, aunque los elementos especiales que fundamentan el delito no concurran en él pero sí en el representado o en la persona jurídica. 33 LPRA sec. 4671 (Énfasis suplido).

La autoría tiene tres modalidades: la autoría directa, la autoría mediata y la coautoría. E.L. Chiesa Aponte, Derecho Penal Sustantivo, op. cit., págs. 178-179. Son coautores el grupo de personas que ejecutan un delito mediante una intervención común, consciente y voluntaria. E.L. Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 179; Muñoz Conde y García Arán, Derecho Penal: Parte General, Valencia, Tirant lo blanch, 2004, pág. 438. La coautoría presupone: (1) un acuerdo de distribución de funciones entre los involucrados y (2) la ejecución común del hecho delictivo. E.L. Chiesa Aponte, Derecho Penal Sustantivo, op. cit., págs. 178-179; Muñoz Conde y García Arán, op. cit., pág. 435. Mientras el plan común previo es considerado el "elemento subjetivo" de la coautoría, la contribución material en la consecución del hecho delictivo es considerada el "componente objetivo". E.L. Chiesa Aponte, op. cit., pág. 179. No basta con que haya un acuerdo de funciones; es necesario que se contribuya materialmente en la realización del delito, de tal modo que la contribución sea considerada un paso significativo del resultado delictivo. Muñoz Conde y García Arán, op. cit., pág. 439; E.L. Chiesa Aponte, op.

cit., pág. 179; E. Bacigalupo, *Derecho penal – Parte general*, Buenos Aires, Editorial Hammurabi, pág. 502. Lo determinante de la coautoría es que varias personas tienen el co-dominio del hecho delictivo en virtud del acuerdo de distribución de funciones, por lo que asumen igual responsabilidad penal al consumarse el delito. Muñoz Conde y García Arán, op cit., pág. 439. Por tal razón, la contribución material de cada coautor, sin importar cómo fue y/o en qué consistió, se consideran como un todo y el resultado lesivo total se le imputa a cada coautor por igual. Íd.

III

La recurrida solicitó un nuevo juicio al amparo de la Regla 192 de Procedimiento Criminal, supra, y el derecho constitucional a un debido proceso de ley. Los requisitos y estándares aplicables bajo ambos fundamentos son distintos. Por lo tanto, al adjudicar solicitudes de nuevo juicio como la de autos, es indispensable que los tribunales identifiquen: (1) cuál es la prueba en cuestión y (2) bajo qué fundamento se presentó la solicitud de nuevo juicio con relación a cada prueba. Lo anterior es fundamental pues no toda "nueva prueba" es prueba que el Estado suprimió u ocultó. Asimismo, como norma general, la prueba en la que se basa la solicitud de nuevo juicio bajo la Regla 192 no puede ser de impugnación.[14] Sin embargo, cuando se solicita un

---

[14] Reconocemos que en *Pueblo v. Rodríguez Rodríguez,* 193 DPR 987, 1000-1001 (2015) evaluamos una solicitud de nuevo juicio bajo la Regla 188(a) de Procedimiento Criminal, 34 LPRA Ap. II, Rs. 188(a), e indicamos que la exigencia de que la solicitud no se base en prueba impugnatoria merece una análisis sosegado. Afirmamos que el mero hecho de que la prueba sea

nuevo juicio al amparo de <u>Brady v. Maryland</u>, supra, y su progenie, la solicitud puede basarse en la supresión u ocultación de prueba de impugnación. Adelantamos que ni el Tribunal de Primera Instancia ni el Tribunal de Apelaciones aplicaron correctamente los estándares.

La controversia en estos casos es legalmente simple pero fácticamente compleja. Primero, es necesario examinar la prueba admitida durante el juicio. Segundo, la "nueva prueba" o la "prueba favorable no revelada por el Estado" debe evaluarse en conjunto con toda la prueba admitida en el juicio. Por último, procede determinar si a la luz de dicho examen se satisface el estándar correspondiente. En cuanto a la moción de nuevo juicio ordinaria, procede determinar si de haber contado con la "nueva prueba" en el juicio es más probable que el acusado hubiera sido inocente que culpable. En cuanto a la solicitud de nuevo juicio extraordinaria, procede determinar si existe una probabilidad razonable que, de haberse divulgado oportunamente la prueba favorable suprimida, el resultado del proceso hubiera sido distinto. Con ello en mente, procedemos a resolver.

A.

Los primeros tres testigos de cargo fueron el **Agte. Concepción Santiago,** el **Agte. Abdol López,** ambos agentes de la División de Servicios Técnicos de la Policía de Puerto Rico, y el **Sr. Francisco Colón,** investigador forense del

---

catalogada como prueba de impugnación no conlleva que la solicitud de nuevo juicio sea rechazada de plano.

Instituto de Ciencias Forenses (ICF). Concepción Santiago acudió a la escena y fotografió la escena de sangre que había en la calle que discurría entre el Head Start y el centro comunal de la Urbanización Alturas de Peñuelas II. El día después fotografió a la víctima, quien presentaba heridas en la parte inferior del rostro, en el muslo izquierdo y en el pecho. Por su parte, Abdol López fotografió la ropa de la víctima, la cual aparentaba tener manchas de sangre, la empacó y la transportó al ICF. Por último, el señor Colón fotografió la escena del crimen días después de los hechos. Identificó dos postes de luz en el área del centro comunal y tres en la calle donde apuñalaron a la víctima.[15]

**Giselle Figueroa Feliciano (Giselle)**, prima de Ashley, declaró que mientras partía el bizcocho escuchó que Steven estaba peleando con Ramón Carlo, hermano de Ashley a quien apodaban "Bule". Salió al estacionamiento y los vio agrediéndose. Vio a Ashley y notó que tenía la boca hinchada, "como si le hubieran dado un puño". Cuando separaron a Steven y a Bule, Steven se dirigió al Head Start y Ashley fue detrás de él. Giselle observó que Ashley sacó una cuchilla del bolsillo posterior derecho del pantalón y que se la entregó a Steven, quien la abrió e introdujo en uno de sus bolsillos. Indicó que no estaba ni muy cerca ni muy lejos del lugar en el que Ashley le entregó la cuchilla a Steven, que el área era bastante visible y que la iluminación era bastante clara

---

[15] Las fotografías tomadas por el Agte. Concepción Santiago, el Agte. Abdol López y el Sr. Francisco Colón fueron admitidas en evidencia.

gracias al poste de luz que había entre el centro comunal y el Head Start. Describió la cuchilla como una de al menos 7 pulgadas de largo. Testificó que a Ashley le gustaba portar cuchillas y que la propia Ashley le había enseñado esa cuchilla cuando la compró, tres meses antes del incidente. Indicó que mientras volvía al centro comunal escuchó a Leslie Figueroa Feliciano[16] y a Luis gritando que apuñalaron a Nelson. Giselle no vio quién apuñaló a Nelson ni en qué parte del cuerpo lo apuñalaron. Expresó que Ashley se molestaba porque Nelson la defendía cuando Steven la golpeaba y que Ashley una vez le expresó que solo quería que la dejaran vivir en paz con Steven y **"que le iba a dar a su mamá por donde más le dolía"**. Declaró que, aproximadamente 20 minutos después que se llevaron a Nelson al CDT, Ashley le empezó a gritar a Lucrecia "que era una puta, que no valía nada y **que se alegraba por lo que estaba pasando"**. Giselle relató que le indicó a Ashley que habían apuñalado a Nelson y que pensara en su hija, a lo que Ashley respondió **que no le importaba pues ella únicamente quería a Steven.**

**Leslie Figueroa Feliciano**, prima de Ashley, declaró que estaba dentro del centro comunal cuando vio un "corre y corre" de gente hacia afuera. Salió y observó a Ashley en el suelo cubriéndose la cara mientras Steven la agredía. Bule defendió a su hermana y comenzó a pelear con Steven. Luego, Steven y Ashley corrieron hacia la calle que pasaba frente

---

[16] Prima de Ashley.

al centro comunal y Bule buscó un palo de picota en su carro. Leslie declaró que observó a Ashley entregarle una cuchilla a Steven y que vio cuando Steven la abrió y la guardó en el bolsillo derecho delantero de su pantalón. Indicó que estaba entre 15 y 20 pies de distancia. Describió la cuchilla como una de aproximadamente 7 pulgadas con cabo oscuro. Declaró que Nelson corrió desde el centro comunal, confrontó a Steven y que, mientras estos discutían, Ashley le quitó el palo de picota a Bule y golpeó dos veces a Nelson en la espalda.[17] Al ser golpeado, Nelson se inclinó hacia adelante, Steven sacó la cuchilla y lo apuñaló en el muslo izquierdo y en la mandíbula. Declaró que Nelson se cayó al suelo y que Steven lo apuñaló por tercera vez en el abdomen.

**Zulaika Rivera Ruiz (Zulaika)**, esposa de Daniel Figueroa, hermano de Nelson, estaba con Leslie cuando todos comenzaron a correr hacia el estacionamiento. Declaró que al salir del centro comunal, vio a Ashley tirada en el suelo y a Steven dándole puños en la cara. Observó cuando Bule peleó con Steven a los puños. Declaró que, luego de la pelea, estando a 7 pies de distancia, vio que Ashley sacó "algo" del bolsillo derecho de su pantalón y se lo dio a Steven, quien lo guardó en uno de los bolsillos de su pantalón. Posteriormente, vio que Nelson confrontó a Steven y observó que Ashley golpeó a Nelson en la espalda dos veces con un palo grueso, de madera, que medía unos 4 pies de largo.

---

[17] Leslie indicó que el palo medía 3 pies de largo y 2 pulgadas de ancho y que, aunque el palo era de picota, no la tenía.

Nelson se dobló hacia adelante como consecuencia de los golpes, Steven sacó una cuchilla de su bolsillo, agarró a Nelson, lo apuñaló en el muslo izquierdo, luego lo apuñaló en el lado derecho de la quijada y, al Nelson caerse al suelo, le dio una tercera puñalada en el abdomen. Zulaika indicó que observó la cuchilla por primera vez cuando Steven se la sacó del bolsillo. La describió como una de 4 pulgadas con una hoja aniquelada de 4 pulgadas más. Zulaika indicó que observó el incidente estando a un pie de distancia de Nelson, a 2 pies de Steven y afirmó que el área estaba iluminada por un poste de luz.

**Luis E. Rodríguez Cruz**, cuñado de Nelson, declaró que estaba dentro del centro comunal con este y que escuchó personas discutiendo, por lo que salió al estacionamiento. Al salir, vio que Steven agredió a Ashley y que, como consecuencia, Bule y Steven comenzaron a pelear. Luego de la pelea, Bule fue al carro a buscar un palo, Steven salió del estacionamiento hacia el Head Start y Ashley corrió detrás de Steven. Luis declaró que –estando a 25 pies de distancia– observó cuando Ashley sacó una cuchilla de su pantalón y se la entregó a Steven. Testificó que Steven abrió la cuchilla, la cual medía entre 6 y 7 pulgadas, y la guardó en el bolsillo derecho de su pantalón. Relató cómo, luego de que Nelson confrontó a Steven, Ashley le quitó el palo a Bule y golpeó a Nelson dos veces por la espalda. Narró que corrió a aguantar a Nelson para evitar que se cayera e indicó que, al ver que Steven sacó una cuchilla de su bolsillo derecho, lo

soltó para que se defendiera. Describió cómo, frente a él, Steven apuñaló a Nelson en el muslo izquierdo, luego en la mandíbula y por último en el abdomen.

**Lucrecia Feliciano Quiñones**, madre de Ashley y de Nelson, declaró que permaneció la mayor parte de la noche dentro del centro comunal con la hija de Ashley. Testificó que no vio la pelea entre Bule y Steven ni la pelea entre Steven y Nelson.[18] No obstante, narró que durante la noche del 23 de febrero de 2009, fecha en la que Nelson murió, se encontró a Ashley y le preguntó: "¿supiste que tu hermano está muerto?" y que Ashley le contestó": **"que se pudra"**, **"que se joda"**, **"no me importa"**, "vete pal carajo hija de puta, tu no vales nada". Relató que esa noche Ashley se tornó agresiva y le dijo: **"te voy a matar como una perra, como le hicimos a mi hermano"**.

El menor **Abimael Figueroa Colón (Abimael)**, hijo del occiso y Lissette, quien a la fecha del juicio contaba con tan solo 11 años de edad, declaró que jugaba en el estacionamiento del centro comunal con sus primitos cuando escuchó que Steven y "Titi Mara" —como Abimael le decía a Ashley— discutían "con malas palabras". Declaró que Steven le dio un puño a "Titi Mara" en la cara, lo que provocó la pelea entre Bule y Steven. Posteriormente, Steven salió al Head Start, "Titi Mara" corrió detrás de Steven, se sacó una

---

[18] Durante el contrainterrogatorio, la defensa la confrontó con una declaración anterior en la que indicó que salió y vio la pelea entre Steven y Ramón Carlo.

cuchilla de su pantalón y se la entregó a Steven, quien se la guardó en el bolsillo. Declaró que su papá se dirigió al Head Start, confrontó a Steven y que, cuando comenzaron a pelear a los puños, "Titi Mara" golpeó a su papá dos veces en la espalda con un tubo. Narró que cuando su papá se inclinó hacia al frente, observó cómo Steven lo agarró y lo apuñaló en el muslo izquierdo, luego en el cuello y finalmente en el estómago. Testificó que Ashley no hizo nada para impedir que Steven apuñalara a Nelson, su papá.

**Lissette Colón Valentín**, entonces pareja de Nelson y madre del menor Abimael, testificó que mientras compartía con Nelson en el centro comunal observó "un corre y corre" hacia el estacionamiento y que fueron los últimos en salir. Le pidió a Nelson que no fuera "al revolú" pero este no le hizo caso y fue a ver qué sucedía. El menor Abimael le indicó a Lissette que Steven agredió a Ashley, que Bule peleó con Steven y que Ashley le dio una cuchilla a Steven. Lissette acudió inmediatamente a donde estaba Steven. Relató que observó la pelea entre Nelson y Steven a 8 ó 9 pies de distancia y que vio cuando Ashley golpeó a Nelson dos veces en la espalda con un tubo.[19] En ese momento, Nelson se inclinó hacia al frente, Steven lo agarró por el cuello y lo apuñaló. Solamente vio cuando Steven apuñaló a Nelson por el cuello porque estaba pendiente a sus hijos.

---

[19] Lissette Colón Valentín (Lissette) indicó que el tubo medía aproximadamente 3 pies de largo.

Por último, el **Dr. Carlos Chávez**, patólogo forense, testificó sobre la causa y manera de muerte de Nelson, a quien le practicó la autopsia el 23 de febrero de 2009. Durante el examen externo, identificó tres heridas de arma blanca: una debajo de la barbilla, otra en el muslo derecho y una debajo del ombligo. Indicó que las heridas tenían una profundidad de 4 pulgadas, 4 pulgadas y 3.75 pulgadas, respectivamente. Opinó que las tres heridas fueron producidas con un arma blanca y que la hoja del arma debió medir al menos 4 pulgadas. Añadió que el occiso presentaba una contusión en la parte posterior del cuello lo cual, opinó, fue producto de la acumulación de sangre tras la ruptura de vasos sanguíneos que, a su vez, se produjo por la puñalada en la mandíbula. Opinó que tal herida en el cuello estaba relacionada con el trayecto de la herida de arma blanca mas no con un golpe contundente. El occiso también presentó abrasiones lineales en el brazo derecho y una contusión en los glúteos, la cual pudo ser producto de un golpe con un objeto contundente.

Antes de someter el caso, el Ministerio Público informó al Tribunal que no utilizaría al Agte. René Rodríguez ni a la Agte. Brunilda Borrero como testigos por constituir prueba acumulativa. Los puso a disposición de la defensa, quien decidió no utilizarlos tras examinarlos por al menos 50 minutos. La defensa optó por no presentar prueba testifical, documental, real, científica ni de tipo alguno a su favor. Se limitó a contrainterrogar a los testigos de cargo. En

fin, la prueba testifical antes reseñada fue la prueba que estuvo ante la consideración del Jurado. Esa fue la prueba que motivó el veredicto unánime de culpabilidad emitido contra Ashley.

Examinada la prueba admitida durante el juicio contra la recurrida, evaluemos la alegada prueba favorable que presuntamente el Estado no reveló a la defensa.

B.

La prueba presuntamente favorable a la recurrida consiste en la siguiente prueba documental: (1) las notas de la agente Borrero; (2) las hojas que la doctora Lugo preparó y anejó al expediente médico de Nelson, en las que plasmó la última conversación que tuvo con él antes de que falleciera y (3) el Informe de Análisis de Escena que preparó el agente Rodríguez.[20] El planteamiento de la recurrida en cuanto a la prueba en cuestión es el mismo. Esta sostiene que de las notas de la agente Borrero no surge que alguna de las personas entrevistadas la noche de los hechos la hubiera involucrado como partícipe o coautora del asesinato de Nelson. Por el contrario, denunció que inicialmente Ashley fue catalogada como supuesta víctima. Adujo que de las hojas que la doctora Lugo preparó y anejó al expediente médico del occiso surgía que Nelson le indicó a la doctora Lugo que quien lo apuñaló fue Steven. Añadió que del Informe de Análisis de Escena no surge mención alguna de que Ashley

---

[20] Petición de Certiorari, Apéndice, págs. 176, 182-185 185. Véase además: Alegato de la recurrida del 5 de abril de 2017, págs. 12, 14 y 15.

hubiera participado en el asesinato de su hermano ni que esta fuera sospechosa.

Nos corresponde determinar si la prueba en cuestión es favorable a la recurrida y si en efecto fue suprimida u ocultada por el Estado. De contestar ambas interrogantes en la afirmativa, nos corresponde evaluar si la prueba favorable suprimida es material a la culpabilidad o al castigo de Ashley. Veamos.

C.

Como cuestión de umbral, notamos que el Tribunal de Apelaciones utilizó el estándar incorrecto al evaluar las dos hojas del expediente médico que preparó la doctora Lugo y las notas de la agente Borrero. De la Moción de Nuevo Juicio y de la Petición de Certiorari presentadas ante el foro *a quo* surge que la contención real de la recurrida es que tal prueba era prueba exculpatoria suprimida por el Estado que socavaba la confianza en el resultado del proceso criminal.[21] Es decir, el análisis a realizar era uno bajo Brady v. Maryland, supra, y su progenie, según delineada en Pueblo v. Velázquez Colón, supra, mas no uno bajo la Regla 192 y Marcano v. Parrilla II, supra. Cabe destacar que aun cuando censuró al foro primario por evaluar la prueba a la luz de los criterios de la Regla 192, el foro apelativo intermedio realizó el mismo examen. Resolvió que el testimonio de la doctora Lugo en cuanto a las hojas del

---

[21] Petición de Certiorari, Apéndice, págs. 7-8, 10-12, 16-17, 35.

expediente médico en cuestión era "prueba creíble, nueva, y probablemente produciría un resultado diferente en el nuevo juicio".[22] En cuanto a las notas de la agente Borrero, el foro *a quo* no expresó haber aplicado estándar alguno.

El peticionario arguye que las notas de la agente Borrero no constituyen prueba favorable porque corroboran el testimonio de los testigos de cargo. Igualmente, sostiene que el que las hojas del expediente médico que se extraviaron no consignaran que Nelson implicó a la recurrida con el delito no constituye una exoneración automática ni es capaz de socavar la confianza en el resultado del juicio o de provocar un dictamen distinto debido a la amplia prueba testifical que presentó el Ministerio Público. Por último, aduce que el Informe de Análisis de Escena en el que se catalogó a Ashley como perjudicada no constituye prueba exculpatoria porque aunque de la prueba de cargo surja que todo inició como un acto de violencia doméstica en el cual Ashley fue la víctima, eventualmente la investigación se centró en Ashley como posible coautora del asesinato de Nelson.

Los argumentos del Estado confunden el carácter favorable de la prueba con su materialidad. Ciertamente la prueba en cuestión no necesariamente hubiera producido una absolución por sí sola; sin embargo, no hemos requerido tal rigurosidad. A la hora de determinar si cierta prueba es

---

[22] Íd., págs. 181-182.

exculpatoria basta con que *pueda* favorecer al acusado, **independientemente de la materialidad o confiabilidad de la prueba**. Pueblo v. Vélez Bonilla, supra, pág. 719 citando a Pueblo v. Echevarría, supra, pág. 333 (Énfasis nuestro). Cuando se clasifica cierta prueba como exculpatoria, lo fundamental es su tendencia a favorecer al acusado mas no el peso o valor probatorio que merezca la prueba y mucho menos el efecto probable de su divulgación oportuna en el resultado del proceso criminal.

Aclarado lo anterior, resolvemos que la prueba en cuestión pudo haber favorecido a la recurrida. De esta no surge que alguna de las personas entrevistadas el día de los hechos la hubiera involucrado con la comisión del delito. Con tal prueba, la defensa podía intentar adelantar la teoría de que Steven actuó solo y que Ashley, quien fue una mera víctima de violencia doméstica, no participó de los hechos delictivos ni proveyó el arma homicida con la que Steven mató a Nelson. Por consiguiente, la prueba en cuestión pudo tener algún valor exculpatorio con respecto a la recurrida. Examinemos si la prueba en efecto fue suprimida.

El peticionario sostiene que ni las notas de la agente Borrero ni el Informe de Análisis de Escena que preparó el agente Rodríguez constituyen "nueva prueba" y que estuvieron disponibles a la defensa. Arguye que el Ministerio Público puso a ambos testigos a disposición de la defensa luego de renunciarlos y que la defensa, luego de entrevistarlos, decidió no utilizarlos como testigos. El argumento del

peticionario es inmeritorio. Este parte de la premisa que la prueba en cuestión debe ser analizada a la luz de los criterios enumerados en la Regla 192 de Procedimiento Criminal, supra. Sin embargo, como indicamos anteriormente, los criterios estatutarios no aplican al caso ante nos. Con respecto a la prueba en cuestión, la solicitud de nuevo juicio se presentó al amparo del debido proceso de ley y se fundó en la supresión de prueba favorable.

El Ministerio Público incumplió con su deber de revelar prueba exculpatoria. Primero, el Ministerio Público no entregó las notas de la agente Borrero a la defensa. Segundo, la copia del récord médico que el Ministerio Público le entregó a la defensa no contenía las dos hojas que la doctora Lugo preparó y anejó al expediente.[23] El peticionario no controvirtió la existencia de las notas de la agente Borrero ni de las hojas que preparó la doctora Lugo. Tampoco afirmó haberle entregado a la defensa tal prueba; únicamente indicó que no eran prueba favorable ni material. Por último, el agente Rodríguez admitió que el Informe de Análisis de Escena siempre estuvo en su posesión ya que nunca lo entregó al Ministerio Público.[24] Resuelto que los documentos en cuestión constituyen prueba exculpatoria, el Ministerio Público debió revelarlos aunque la defensa no los solicitara e independientemente de que estuvieran en posesión de la

---

[23] Petición de Certiorari, Apéndice, págs. 178-181.

[24] Íd., págs .186-187.

Policía de Puerto Rico. _Pueblo v. Velázquez Colón_, supra, pág. 336 reafirmando _Pueblo v. Cancel Hernández_, 111 DPR 625, 628 (1981) y _Pueblo v. Rodríguez Sánchez_, 109 DPR 243, 247 (1979); _Pueblo v. Arzuaga_, supra, pág. 538; _Pueblo v. Santa-Cruz_, 149 DPR 223, 235 (1999); Regla 95(b) de Procedimiento Criminal, _supra_. Ahora bien, ¿la prueba favorable suprimida es material, por lo que justifica la revocación de la convicción y la concesión de un nuevo juicio? Entendemos que no.

Primeramente, observamos que la Sentencia del Tribunal de Apelaciones cuya revocación se nos solicita afirma concluyentemente que la prueba en cuestión hubiera arrojado una luz diferente en el juicio al punto de socavar la confianza en el resultado. Sin embargo, está huérfana y carece de explicación alguna sobre cómo o por qué es razonablemente probable que la prueba en cuestión hubiera producido un resultado distinto en el juicio. Tampoco hace referencia alguna a la prueba admitida durante el juicio contra la recurrida, de lo cual podemos colegir que no la consideró. Enfatizamos que los foros inferiores tienen el deber ineludible de evaluar ponderadamente la prueba favorable suprimida a la luz de toda la prueba admitida durante el juicio. Solo de esta forma el juzgador puede colocarse en mejor posición de realizar un análisis correcto y acercarse a la verdad.

La recurrida sostiene que de las notas de la agente Borrero surge que ella era considerada "supuesta

perjudicada" en el incidente mas no sospechosa, debido a que los entrevistados indicaron que la pelea entre Steven y Nelson surgió a raíz de la discusión que hubo entre Steven y Ashley. Añade que en las hojas del expediente médico de Nelson que se extraviaron, la doctora Lugo plasmó la conversación que tuvo con el occiso en cuanto a lo acontecido y sobre la persona responsable de sus heridas. Indica que Nelson solo vinculó a Steven como su agresor. Asimismo, arguye que del Informe de Análisis de Escena no surge que Ashley fue vinculada con el delito. La recurrida entiende que debido a que la prueba en cuestión únicamente vinculó a Steven con el hecho delictivo, ello la exoneraba y socavaba la confianza en el veredicto de culpabilidad que recayó en su contra. No podemos otorgarle a la prueba en cuestión el significado que la recurrida pretende.

Ciertamente, de haberse divulgado, las notas de la agente Borrero, las hojas preparadas por la doctora Lugo y el Informe de Análisis de Escena hubieran tendido a favorecer a la recurrida. Empero, ese no es el estándar que la recurrida debía satisfacer para obtener un nuevo juicio. No basta con que la prueba suprimida le sea favorable. Esta tenía que demostrar que existía una probabilidad razonable de que el resultado del juicio criminal hubiera sido otro si los documentos no revelados hubieran sido divulgados oportunamente a la defensa. Tenía que convencernos que la prueba favorable suprimida arrojaba una luz diferente en el juicio al extremo de socavar la confianza en el veredicto de

culpabilidad que recayó en su contra. Sin embargo, no lo hizo. Luego de escuchar la totalidad de la regrabación del juicio, examinar los autos y sopesar los planteamientos de ambas partes concluimos que la prueba en cuestión no arroja una luz diferente en el caso al punto de socavar la confianza en el veredicto unánime de culpabilidad que emitió el Jurado.

Al emitir el veredicto, el Jurado sabía que la chispa que encendió la cadena de eventos que culminó en la muerte de Nelson fueron los golpes que Ashley recibió por parte de Steven, su entonces pareja. Giselle declaró que al salir del centro comunal vio que Ashley tenía la boca hinchada, como si le hubieran dado un puño. Leslie, Zulaika, Luis y el menor Abimael declararon que observaron cuando Steven agredió a Ashley. El testimonio de estos no fue controvertido durante sus contrainterrogatorios. Por lo tanto, el que la agente Borrero catalogara a Ashley como "supuesta perjudicada" en las notas que preparó durante la etapa investigativa del caso, lejos de exonerarla, acreditó la prueba de cargo no controvertida en cuanto a que Ashley fue víctima de algún tipo de agresión por parte de Steven durante la noche de los hechos.

En cuanto a las hojas del expediente médico que se extraviaron, es menester señalar que la prueba realmente en controversia son las declaraciones que le hizo Nelson a la doctora Lugo, según fueron plasmadas por esta en las hojas extraviadas. A estos efectos, la doctora Lugo testificó en la Vista Evidenciaria que le preguntó a Nelson "qué era lo

que le había sucedido. Que por qué venía en ese estado."[25] A continuación, reseñamos la respuesta de la doctora Lugo en la que la recurrida se basa para sostener que Nelson no la vinculó con la comisión del hecho delictivo.

> R: [Nelson] me dice que fue que había sido apuñaleado por su cuñado y me dice el nombre de "Steven". Me menciona que estaba en una actividad familiar en un centro comunal y que él vio que Steven, su cuñado, golpea a su hermana. Y ahí me hizo un paréntesis y me dice "ah doctora es que él es un abusador, el golpeó a mi hermana y golpeaba a mi hermana" y que se enfrascaron en una discusión y que en la discusión Steven fue el que le produjo las puñaladas, fue lo que él me mencionó a mí.
>
> P: ¿Cómo usted percibió que era el sentir de Nelson en relación a su hermana durante la narración de estos eventos a usted[?]
>
> R: Él en todo momento se refirió a Steven como el agresor. O sea, él mencionaba "él fue el que me hizo esto doctora, él fue el que me hizo esto".[26]

La recurrida sostiene que las declaraciones de Nelson que la doctora Lugo plasmó producirían un resultado diferente en el juicio. Enfatiza el hecho de que Nelson no vinculó a su hermana con el delito a pesar de que fue agredido en horas del día y tuvo de frente a su agresor. Sin embargo, no existe disputa real en cuanto a que el crimen fue cometido en horas de la noche.[27] La prueba desfilada en el juicio también estableció que Nelson estuvo de frente a Steven cuando este lo apuñaló.

---

[25] Petición de Certiorari, Apéndice, pág. 176.

[26] Íd.

[27] Así lo hicieron constar todos los testigos oculares. De las denuncias y las acusaciones también surge que los delitos imputados fueron cometidos durante horas de la noche. Petición de Certiorari, Apéndice, págs. 27-29. Véase también: Alegato de la recurrida, pág. 12

Si bien es cierto que las declaraciones de Nelson no vincularon a Ashley con el delito, tampoco la desligaron. Del testimonio de la doctora Lugo se puede llegar a una sola conclusión: Nelson estaba seguro que Steven fue quien lo apuñaló. La doctora Lugo en ningún momento indicó que el occiso exculpó a Ashley ni que negó categóricamente que Ashley fuera quien facilitó el arma homicida. De las declaraciones de Nelson no surge mención alguna sobre la procedencia de la cuchilla. Las declaraciones de Nelson no contradicen la prueba de cargo que vinculó a Ashley con la entrega del arma homicida. A lo sumo, tal prueba corrobora el testimonio de Giselle, Leslie, Zulaika, Luis, el menor Abimael y Lissette, quienes declararon que Steven fue quien apuñaló a Nelson.

La recurrida arguye que el Informe de Análisis de Escena que preparó el agente Rodríguez la exonera. Indica que a pesar de que el Informe detalla la labor del agente al intervenir con la escena del crimen y con los testigos del caso, no se le mencionó ni se le vinculó con conducta delictiva alguna relacionada a la muerte de su hermano. No podemos otorgarle a la prueba en cuestión el alcance que la recurrida pretende. El Informe recoge la información preliminar que recopiló el agente Rodríguez al investigar la escena del crimen y las circunstancias en las que murió Nelson.[28] El Informe fue preparado el 22 de febrero de 2009

---

[28] El Informe de Análisis de Escena se compone de las siguientes secciones: la información personal de la agente custodia de la escena (agente informante), Agte. Brunilda Borrero; la fecha y hora en la que

a las 10:00 p.m., minutos después de que Nelson falleciera. Contrario a lo que sugiere la recurrida, de los autos surge que a esa fecha el agente Rodríguez solamente había entrevistado a Luis.[29] Aún no había entrevistado a los demás testigos de cargo.[30] Cabe resaltar que Luis –el único testigo que el agente Rodríguez había entrevistado al momento– sí vinculó a Ashley con la entrega del arma homicida cuando el agente lo entrevistó. Si bien es cierto que el agente Rodríguez no lo hizo constar en el Informe, ello no significa que Ashley no fuera considerada sospechosa de conducta delictiva alguna como la recurrida propone. Nos explicamos.

El 23 de febrero de 2009, un día después de la muerte de Nelson, a las 3:00 p.m., el agente Rodríguez preparó unas notas en las que apuntó los datos personales de las personas a las que consideró "sospechosos", a saber: Steven y **Ashley**.[31] Catalogó a la recurrida como **"co-autora"** e hizo constar que golpeó a Nelson en la espalda con un palo y que

---

informó el delito; la información personal del agente investigador, Agte. René Rodríguez; las condiciones atmosféricas y de iluminación en la escena; la descripción del lugar de los hechos y de la escena del crimen; el lugar y las condiciones donde se encontró el cadáver; una descripción de armas, drogas y/u otra evidencia ocupada en la escena; la información personal y la descripción física del occiso; fotografías, videos, croquis o huellas dactilares desarrolladas; la descripción de las pertenencias del occiso; la posición en la que el agente investigador encontró el cadáver; el lugar donde el occiso recibió las heridas; una descripción de los vehículos relacionados con los hechos y un espacio para hacer constar observaciones.

[29] Luis fue entrevistado el 22 de febrero de 2009 a las 6:45 p.m.

[30] Leslie Figueroa y Zulaika Rivera fueron entrevistadas el 23 de febrero de 2009 a las 7:30 p.m. y 8:40 p.m., respectivamente. El menor Abimael Figueroa fue entrevistado el 5 de marzo de 2009 a las 10:45 a.m.

[31] Las notas del Agte. René Rodríguez fueron admitidas en evidencia durante la Vista Evidenciaria del 18 de diciembre de 2013.

fue quien le entregó a Steven la cuchilla con la cual este apuñaló a Nelson. Destacamos que en ese momento el agente Rodríguez tampoco había entrevistado a los demás testigos oculares. Es decir, contrario a lo que sugiere la recurrida, el agente Rodríguez aún no había entrevistado a Leslie, Zulaika, el menor Abimael y ya había catalogado a Ashley como "sospechosa" de la muerte de su hermano.

Al sopesar la materialidad de la prueba en cuestión, debemos tener presente que Ashley fue acusada y convicta **a título de coautora** de forma unánime. Su contribución en el hecho delictivo consistió en entregarle a Steven el arma blanca con el cual este le propinó a Nelson las tres puñaladas que le causaron la muerte. El Jurado consideró tal contribución como una significativa y sin la cual no se hubiera podido llevar a cabo el hecho delictivo. Por todo lo anterior, y debido a que cada coautor responde por el resultado lesivo total sin importar cuál haya sido su contribución material, Ashley fue declarada culpable de asesinato en primer grado aun cuando la prueba admitida demostró que Steven fue quien apuñaló a Nelson.

La recurrida intentó demostrar que nadie la vinculó con las puñaladas ni con la entrega del arma homicida. Ambas contenciones son inmeritorias. Por un lado, al igual que ocurrió en Brady v. Maryland, supra, es inmaterial si fue Steven o Ashley quien apuñaló a Nelson; la muerte de Nelson es imputable a ambos por igual. E.L. Chiesa Aponte, op cit., pág. 30, n.23; Art. 45 del Código Penal de 2004, 33 LPRA

sec. 4667. Por otro lado, la prueba en cuestión no arroja una luz diferente en cuanto a los elementos objetivo y subjetivo de la coautoría con respecto a Ashley, razón por la cual dicha prueba no es material en cuanto a su culpabilidad. El Jurado consideró probado más allá de duda razonable que Ashley y Steven tenían la resolución común de matar a Nelson (elemento subjetivo) y que Ashley contribuyó significativamente al entregarle a Steven la cuchilla con la que este lo mató (elemento objetivo).

La prueba en cuestión no contradice la prueba testifical desfilada en el juicio. El Jurado escuchó y creyó el testimonio no controvertido de Giselle, Leslie, Zulaika, Luis y del menor Abimael, quienes declararon que observaron cuando Ashley le entregó a Steven la cuchilla. Las declaraciones de dichos testigos fueron similares en cuanto a la descripción de la cuchilla y consistentes en la forma y manera en la que Ashley entregó el arma homicida a Steven. Giselle, Leslie, Luis y el menor Abimael indicaron que al tomar la cuchilla que Ashley le entregó, Steven la abrió y se la colocó en un bolsillo. En cuanto a la cuchilla, Giselle y Leslie indicaron que esta medía un total de 7 pulgadas de largo y que la hoja medía unas 3 pulgadas. Zulaika indicó que la cuchilla medía un total de 8 pulgadas y que la hoja medía 4 pulgadas. Por su parte, Luis y el menor Abimael declararon que la cuchilla medía un total de 6 ó 7 pulgadas de largo. El Dr. Carlos Chávez opinó que la hoja del arma homicida debió medir al menos 4 pulgadas.

Además de la prueba testifical consistente y no controvertida, el Jurado escuchó admisiones de Ashley por voz de Giselle y Lucrecia. Por un lado, Giselle declaró que, en una ocasión, Ashley le indicó que solo quería que la dejaran vivir en paz con Steven y que **le daría a Lucrecia, su madre, por donde más le dolía**. Asimismo, Giselle testificó que 20 minutos después de que Nelson fue trasladado al CDT le comentó a Ashley que Nelson fue apuñalado y que esta le contestó que no le importaba y que a quien único quería era a Steven. Por otro lado, Lucrecia declaró que cuando volvió a su casa durante la noche de los hechos, se encontró a Ashley y que al preguntarle a esta si sabía que apuñalaron a Nelson, Ashley le contestó: "que se pudra", "que se joda", "no me importa" "vete pal carajo hija de puta, tú no vales nada". Añadió que Ashley se tornó agresiva y que le gritó: **"te voy a matar como una perra, como le hicimos a mi hermano"**. Esta fue la prueba que el Jurado escuchó antes de emitir el veredicto unánime de culpabilidad.

No existe una probabilidad razonable de que la prueba en cuestión, de haberse divulgado oportunamente, hubiera producido un resultado distinto. No estamos ante la supresión de la confesión de uno de los coacusados que, a su vez, fue testigo de cargo. Véase: Brady v. Maryland, supra, págs. 84-85. Tampoco estamos ante la supresión de prueba que impugnaba la credibilidad del único testigo de cargo que identificó y/o conectó al acusado con la comisión del delito. Véanse: Wearry v. Cain, supra, págs. 1006-1007; Smith v. Cain, supra,

pág. 630; Pueblo v. Velázquez Colón, supra, pág. 317; Kyles v. Whitley, supra, págs. 441-442; U.S. v. Giglio, supra, págs. 154-155.

Luego de considerar la prueba favorable suprimida, a la luz de toda la prueba admitida durante el juicio, concluimos que esta es muy débil para cumplir con el estándar de materialidad requerido por Brady v. Maryland, supra. La prueba en cuestión es acumulativa y no contradice la prueba incriminatoria admitida en el juicio. U.S. v. Agurs, supra, pág. 115. Se aparta considerablemente de los hechos que el Jurado consideró probados. Para sostener la teoría de la recurrida tendríamos que concluir que al menos cinco personas mintieron al declarar que observaron cuando Ashley le entregó a Steven el arma homicida. Véase: Turner v. U.S., supra, pág. 1894. La recurrida no nos ha puesto en esa posición. En fin, las notas de la agente Borrero, las hojas del expediente médico de Nelson que preparó la doctora Lugo y el Informe de Análisis de Escena suscrito por el agente Rodríguez no socavan la confianza en el veredicto unánime de culpabilidad que emitió el Jurado contra la recurrida. Consecuentemente, erró el foro a quo al concederle un nuevo juicio a la recurrida.

IV

Por todo lo anteriormente expuesto, se revoca la Sentencia recurrida. Debido a que la prueba favorable suprimida por el Ministerio Público no era material a la culpabilidad ni al castigo de la recurrida, según requerido

por <u>Brady v. Maryland</u>, supra, y su progenie, erró el Tribunal de Apelaciones al dejar sin efecto la Resolución emitida por el Tribunal de Primera Instancia y conceder un nuevo juicio. Se devuelve el caso al foro de instancia para la continuación de los procedimientos consistentes con estos pronunciamientos.

Se dictará Sentencia de conformidad.


Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico | | *Certiorari* |
| Peticionario | | |
| v. | | CC-2016-0055 |
| Ashley M. Torres Feliciano | | |
| Recurrida | | |

SENTENCIA

En San Juan, Puerto Rico, 28 de agosto de 2018.

Por todo lo anteriormente expuesto, se revoca la Sentencia recurrida. Debido a que la prueba favorable suprimida por el Ministerio Público no era material a la culpabilidad ni al castigo de la recurrida, según requerido por Brady v. Maryland, supra, y su progenie, erró el Tribunal de Apelaciones al dejar sin efecto la Resolución emitida por el Tribunal de Primera Instancia y conceder un nuevo juicio. Se devuelve el caso al foro de instancia para la continuación de los procedimientos consistentes con estos pronunciamientos.

Lo acordó y manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez concurre con opinión. El Juez Asociado señor Colón Pérez concurre sin opinión. La Juez Asociada señora Rodríguez

Rodríguez y el Juez Asociado Estrella Martínez disienten sin opinión.


                              Juan E. Dávila Rivera
                          Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

     Peticionario

        v.

Ashley M. Torres Feliciano

     Recurrida

CC-2016-0055    *Certiorari*


Opinión concurrente que emitió la Jueza Presidenta Oronoz Rodríguez


En San Juan, Puerto Rico, a 28 de agosto de 2018.

Concurro en el resultado de la Opinión que antecede por entender que la Mayoría erró en su análisis de <u>Brady v. Maryland</u>, 373 US 83 (1973), respecto a las dos piezas de evidencia siguientes: (1) las notas de la Agte. Brunilda Borrero; y (2) las dos hojas que la Dra. Sylvette Lugo presuntamente anejó al expediente médico del Sr. Nelson Figueroa Feliciano.

Primero, considero que no procedía analizar las notas de la agente Borrero al amparo de la regla de <u>Brady v. Maryland</u>, <u>supra</u>, porque la Sra. Ashley M. Torres Feliciano no alegó que el Estado las suprimió y de los autos surge claramente que el

Estado, en efecto, las entregó. En particular, en su moción de nuevo juicio la señora Torres Feliciano no arguyó que el Estado suprimió las notas de la agente Borrero. Tampoco lo argumentó en el recurso de *certiorari* que interpuso ante el foro apelativo intermedio ni en el alegato en oposición que presentó ante este Tribunal. La señora Torres Feliciano siempre mantuvo que el Estado solo suprimió: (1) el *Informe de Análisis de Escena* que el Agte. René Rodríguez Delgado preparó; y (2) las dos hojas que la doctora Lugo anejó al expediente médico del señor Figueroa Feliciano. Así, de los autos no se colige pretensión alguna al amparo de la regla de Brady v. Maryland*,* supra*,* fundamentada en la supresión de esas notas. **De hecho, en los autos del Tribunal de Primera Instancia obra una moción que el Ministerio Público presentó -intitulada *Contestación a moción en razón de la Regla 95 de las de Procedimiento Criminal y el debido procedimiento de ley*- en donde se indica claramente que el Estado entregó a la defensa las notas de la agente Borrero como parte del descubrimiento de prueba.** Autos del Tribunal de Primera Instancia, T. I, págs. 25-27. Las comparecencias posteriores no indican que la señora Torres Feliciano haya puesto en controversia la veracidad de lo expuesto en esa moción. Íd. Por tanto, este Tribunal no debió incluir las notas de la agente Borrero en su análisis de Brady v. Maryland*,* supra. Menos aún concluir que el Estado las suprimió. Véase, sin embargo, *Opinión* mayoritaria, Parte III.C.

Segundo, estimo que la Mayoría también erró en su análisis respecto a las dos hojas que la doctora Lugo anejó al expediente médico del señor Figueroa Feliciano porque la señora Torres Feliciano no probó que el Estado las tenía y que las suprimió. Las dos hojas no se presentaron en evidencia, sino que **la doctora Lugo solo testificó que las redactó y las anejó al expediente**. *Sentencia* del Tribunal de Apelaciones, págs. 20-22. No obstante, esto no prueba que el Ministerio Público las tenía o que tenía control sobre ellas. **De hecho, surge de los autos una copia certificada del expediente médico que entregó el propio Hospital al Estado para ser utilizada en el juicio y de la cual no surgen las presuntas dos hojas.**

Conviene resaltar que esa copia tiene una hoja de certificación del Hospital que desglosa todos los documentos incluidos y la cantidad de páginas que contiene cada uno. Además, las páginas están selladas con un número de identificación que coincide con lo esbozado en la hoja de certificación. Toda la información que se certificó como entregada está en la copia certificada, salvo un documento intitulado *Autorización para trámite y responsabilidad de pago*. **La hoja de certificación no indica que el hospital entregó las dos hojas que la doctora Lugo presuntamente anejó al expediente médico del señor Figueroa Feliciano.**

Cuando una persona promueve un *Brady Claim*, esta tiene que probar, en cuanto a la alegada supresión de la prueba por parte del estado, que: (1) la presunta prueba realmente

existe; (2) esa prueba estaba en posesión del Estado; y (3) el Estado no la entregó -la suprimió-. Véase, a modo persuasivo, United States v. Calderón, 829 F.3d 84 (1st Cir. 2016) ("Under *Brady*, the government cannot be faulted for failing to turn over information it did not have."); United States v. Maldonado-Rivera, 489 F.3d 60, 67 (1st Cir. 2007) ("For *Brady* to operate, the government not only must know about undisclosed evidence but also must have custody or control of that evidence."). Así, correspondía a la señora Torres Feliciano probar ante el foro primario que el Estado tenía las dos hojas y que las suprimió. No lo hizo.

En vista de lo anterior, entiendo que se puede concluir razonablemente que la señora Torres Feliciano probó la **existencia** de las dos hojas mediante el testimonio de la doctora Lugo. **Sin embargo, no probó que el Estado sabía que existían, tenía control sobre las mismas y no las entregó.** Por tanto, considero que no se puede concluir que el Estado realmente las suprimió. **Máxime cuando de la propia hoja de certificación del Hospital surge que no se entregaron las dos hojas al Estado.** Véase, sin embargo, *Opinión* mayoritaria, Parte III.C.

Consecuentemente, discrepo del análisis que realizó una Mayoría de este Tribunal en cuanto a estas dos piezas de evidencia. Estimo, en cambio, que la pretensión de la señora Torres Feliciano debió rechazarse sin entrar a analizar la favorabilidad o materialidad de las notas de la agente

Borrero y las dos hojas de la doctora Lugo al amparo de la regla de <u>Brady v. Maryland</u>, <u>supra</u>.


                                        Maite D. Oronoz Rodríguez
                                             Jueza Presidenta